# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Robert T. Gast, Jr.,                                          Civ. No. 13-1406 (JJK)

      Plaintiff,

v.                                                            **MEMORANDUM**
                                                              **OPINION AND ORDER**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

      Defendant.

---

Gregg B. Nelson, Esq., Social Security Disability Law Center, LLC; and Thomas A. Krause, Esq., Schott Mauss & Associates PC, counsel for Plaintiff.

Ann M. Bildtsen, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Robert T. Gast, Jr., seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits.  This matter is before the Court on the parties' cross-motions for summary judgment.  (Doc. Nos. 18, 25.)  The parties have consented to this Court's exercise of jurisdiction over all proceedings in this case pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Doc. Nos. 10, 11.)  For the reasons stated below, this Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.

**BACKGROUND**

**I.    Procedural History**

Plaintiff filed an application for disability insurance benefits on June 22,

2010, alleging a disability onset date of March 1, 2008.  (Tr. 119–20.)[1]  Plaintiff's

date last insured is March 31, 2012.[2]  (Tr. 12.)  The Social Security

Administration ("SSA") denied Plaintiff's claim initially and on reconsideration.

(Tr. 69–73, 79–81.)  Plaintiff timely requested a hearing before an Administrative

Law Judge ("ALJ"), and the hearing was held on April 5, 2012.  (Tr. 83–84, 34–

61.)  On April 11, 2012, the ALJ issued an unfavorable decision on Plaintiff's

application.  (Tr. 9–33.)  Plaintiff sought review of the ALJ's decision, but the

Appeals Council denied the request for review on April 12, 2013.  (Tr. 1–6.)

Denial by the Appeals Council made the ALJ's decision the final decision of the

Commissioner.  *See* 20 C.F.R. § 404.981.

**II.    Background**

Plaintiff, born on January 22, 1958, was fifty years old on his alleged onset

date of disability, March 1, 2008.  (Tr. 119.)  Plaintiff has a Master's degree in

plant physiology, and he completed all but his thesis in a Ph.D. program and

---

[1]    Throughout this Report and Recommendation, reference to the
Administrative Record (Doc. No. 9), for this case is made by using the
abbreviation "Tr."

[2]    A claimant has to establish "the existence of a disability on or before the
date that the insurance coverage expires."  *Basinger v. Heckler*, 725 F.2d 1166,
1168 (8th Cir. 1984).

worked as a researcher.  (Tr. 337.)  Plaintiff was unable to finish his thesis due to

his bipolar disorder, and he was hospitalized for a manic episode in 1989.

(Tr. 338.)

Plaintiff was diagnosed with Fabry disease[3] in 2000 and developed kidney

dysfunction.  (Tr. 338.)  In 2002, he committed a sexual offense by having a

relationship with a 15-year-old girl.  (Tr. 339.)  He has been in court-ordered

treatment since then.  (*Id.*)  Plaintiff more recently went to vocational school to

become a machinist and cabinet maker, working in those industries since 2001.

(Tr. 337.)

Plaintiff completed a function report for the SSA in 2008, describing his

daily activities.  (Tr. 185–92.)  He did mental exercises using computer

applications.  (Tr. 189.)  He studied for jobs and went to the workforce center to

look for part-time jobs.  (*Id.*)  He watched television and read.  (Tr. 189.)  If he

had trouble sleeping at night, he took a nap during the day.  (Tr. 185.)  He

shopped and had dinner with others in his apartment building.  (Tr. 187–88.)

He could both drive and use public transportation.  (Tr. 188.)  He talked to his

---

[3]      Fabry Disease is caused by a lack of enzyme needed to metabolize lipids.
The disease may lead to impaired arterial circulation and kidney dysfunction.
Symptoms include burning sensations in the hands, noncancerous skin
blemishes, sweating, fever, and gastrointestinal symptoms.  The disease is
treated with enzyme replacement therapy to reduce lipid storage, and medication
for pain and gastrointestinal symptoms.  *National Institute of Health and National
Institute of Neurological Disorders and Stroke*, Fabry Disease Information Page,
http://www.ninds.nih.gov/disorders/fabrys/fabrys.htm (last visited August 11,
2014).

sister and friends on the phone.  (Tr. 189–90.)  At times, he had difficulty with

memory and concentration.  (Tr. 190.)  He followed instructions well and got

along with authority figures fairly well.  (Tr. 190–91.)

Plaintiff's neighbor, Steve Clasen, completed a third party function report

regarding Plaintiff on January 9, 2009, which stated the following.  (Tr. 205–13.)

Plaintiff wore dirty clothes and did not bathe often enough.  (Tr. 207.)  Plaintiff

was able to do housework and yard work.  (Tr. 208.)  He had trouble

remembering to pay bills.  (Tr. 209.)  He was often late because he lost track of

time.  (Tr. 210.)  He left tasks unfinished.  (Tr. 211.)  And he did not handle stress

well, but he followed instructions pretty well.  (Tr. 211–12.)

## A.    Medical Records

Plaintiff suffers peripheral neuropathy caused by Fabry disease.  (Tr. 358.)

The disease is treated with enzyme replacement therapy.[4]  (*Id.*)  Plaintiff is also

treated for mental impairments in the context of court-ordered sexual offender

treatment.  (Tr. 357, 339, 444.)  In early January 2007, Plaintiff saw his

psychologist, Dr. Beatrice Robinson.  (Tr. 427.)  At that time, Plaintiff's

impairments were listed as obsessive-compulsive personality disorder; bipolar

disorder; and avoidant, schizotypal personality disorder.  (*Id.*)

---

[4]    Fabrazyme is given by infusion at a slow rate, while carefully monitoring for adverse reactions.  *Genzyme Corporation*, Fabrazyme Preparation & Administration, http://www.fabrazyme.com/hcp/treat/FZ_R_and_A_Fact_Sheet .pdf (last visited July 16, 2014).

On January 18, 2007, Plaintiff reported concern with a recent loss of memory, but he stated he did not think it was a major problem.  (Tr. 351.)  He reported that he was very busy at work but did not feel unduly stressed or anxious.  (*Id.*)  The record reflects that Plaintiff was taking Tegretol and Prozac, and, particularly in the context of his partial renal failure, Plaintiff's Tegretol levels could become unusually high and contribute to cognitive and memory problems. (*Id.*)  Dr. Chester Whitley noted he would watch Plaintiff's Tegretol levels, a possible cause of cognitive and memory problems.  (*Id.*)  However, the doctor noted that the symptoms at that time were minimal and limited enough not to cause much concern.  (*Id.*)

The following day Plaintiff saw Nurse Fran Rowan and Dr. Nancy Richmond for medication management for bipolar II disorder.  (Tr. 443–44.) Plaintiff denied feeling depressed and said he was using light therapy to treat his seasonal affective disorder.  (*Id.*)  He was sleeping eight hours at night but did not feel rested.  (*Id.*)  Nurse Rowan noted that Plaintiff was not very cooperative with treatment and he wore soiled clothes that day.  (*Id.*)  Plaintiff said his mood was okay, but Nurse Rowan noted that his affect was mildly dysphoric.  (*Id.*)  She stated that his thought processes were "somewhat logical and coherent," but his memory regarding a recent months-long period of cognitive decline was incorrect.  (*Id.*)  She also noted that Plaintiff seemed to be very obsessive about work, and his judgment and insight were fair to poor.  (*Id.*)

On January 30, 2007, Dr. Robinson noted that Plaintiff seemed tired and "somewhat confused, in the grip of his obsessive-compulsive disorder." (Tr. 426.) She believed Plaintiff's excessive work hours related to his inability to set boundaries and his need for companionship and socialization. (*Id.*) At that time, Plaintiff agreed not to work more than forty hours per week. (*Id.*) In February, Dr. Robinson noted that Plaintiff was continually late for treatment and unable to set limits on his work, working thirty hours overtime without pay. (Tr. 425.) Plaintiff again agreed to specific work hours, constituting forty-five hours per week, which would allow him to arrive for treatment in a timely manner. (*Id.*) Then, in March, Dr. Robinson confronted Plaintiff about not making treatment a priority. (Tr. 423.)

On March 6, 2007, Nurse Rowan noted that Plaintiff appeared pale, thinner, and somewhat disheveled, but that he said he was fine. (Tr. 441.) His affect was constricted and dysthymic. (*Id.*) His psychomotor evaluation indicated cognitive and memory difficulties and he did not always process information logically and coherently. (*Id.*) Nurse Rowan noted that his work-related behavior was obsessional, and his judgment and insight were fair to poor. (*Id.*) In addition, Plaintiff was defensive about discontinuing his use of Neurontin because it made him feel hung over during the day. (*Id.*) At that time, Nurse Rowan explained to Plaintiff that he had to be careful with medication changes due to his kidney disorder, and he needed to monitor his hypomanic symptoms. (Tr. 441–42.)

On April 3, 2007, Plaintiff saw Dr. Robinson.  He was depressed at that time because he had been in a car accident and hit a pedestrian.  (Tr. 421.) Plaintiff reported that there might be financial consequences from the accident, and he had spent the substantial sum of money he had received from his parents' estate in 1991.  (*Id.*)  Plaintiff indicated, however, that his sister agreed to be his representative-payee to help him manage his finances.  (*Id.*)

On April 12, 2007, Plaintiff had enzyme replacement therapy and Dr. Whitley noted that Plaintiff had ongoing acroparesthesias[5] and gastrointestinal problems.  (Tr. 346.)  Plaintiff's adverse infusion reactions were, at the time, well-controlled with medication.  (*Id.*)

Two weeks later, Dr. Nancy Raymond reevaluated Plaintiff due to concern that his obsessive compulsive personality disorder was interfering with his sex offender treatment.  (Tr. 438.)  Plaintiff had difficulty completing things because he was a perfectionist, he was a workaholic, and he hoarded things he would never use.  (Tr. 438–39.)  Dr. Raymond noted that treatment would be difficult because, with his Fabry disease, medication might cause cognitive impairment. (Tr. 439.)  Dr. Raymond discontinued Plaintiff's Prozac because Plaintiff was having trouble focusing, but she noted that Plaintiff's mental status was normal, with the exception of mildly flat affect.  (*Id.*)  Dr. Raymond assessed a GAF score

---

[5]     Acroparesthesias are abnormal sensations, such as burning or tingling, of one or more of the extremities.  *Stedman's Medical Dictionary* 1316 (27th ed. 2000).

of 70[6] and diagnosed bipolar disorder and obsessive personality disorder.
(Tr. 439–40.)

On June 5, 2007, Plaintiff saw Nurse Rowan after he had a manic
episode, staying up all night working, after he switched from Prozac to Celexa.
(Tr. 435.)  Nurse Rowan was concerned about Plaintiff's weight loss and obvious
cognitive impairment at that time.  (Tr. 435–36.)  She noted that his concentration
had improved since starting Celexa, but his memory was still up and down.  (*Id.*)
Plaintiff's weight was down, and he said he was not eating well because he could
not afford food.  (Tr. 435–36.)  In addition, Plaintiff was poorly groomed, and his
speech was slow in rate and rhythm.  (Tr. 436.)  His psychomotor evaluation
indicated cognitive slippage, his thought processing was not logical or coherent,
and his insight and judgment were very poor.  (*Id.*)  Nurse Rowan recommended
neuropsychological testing.  (*Id.*)

Two days later, Plaintiff saw Dr. Whitley for enzyme replacement therapy
and reported having difficulty with memory and day-to-day functioning.

---

[6]     The Global Assessment of Functioning Scale "GAF" was used by clinicians
under the Diagnostic and Statistical Manual of Mental Disorders, fourth edition
text revision, in effect since 2000 ("*DSM-IV-tr*"), to subjectively rate the social,
occupational, and psychological functioning of adults.  *DSM-IV-tr* at 32.  On a
scale of zero to one hundred, scores between 61 and 70 indicate some mild
symptoms, such as depressed mood and mild insomnia, or some difficulty in
social, occupational, or school functioning, but generally functioning pretty well.
*Id.* at 34.  The GAF scale is no longer used under the DSM-V, in effect since
2013.  Schacter, Gilbert, & Wegner, *DSM-V Updates*, Introducing Psychology,
http://worthpublishers.com/Catalog/samplechapters/316_UpdatesDSM5_Schacte
r_Intro2e.pdf (last visited August 11, 2014).

(Tr. 343–44.)  Dr. Whitley noted that Plaintiff was very intelligent, but his problems were significantly impairing his quality of life.  (Tr. 343.)  On examination, Plaintiff seemed mildly depressed and was concerned over the financial and legal ramifications of his car accident.  (Tr. 344.)  In addition, Dr. Whitley noted Plaintiff's body habitus was bordering on cachectic.[7]  (*Id.*)

Plaintiff continued to work overtime and was late for treatment with Dr. Robinson in June 2007.  (Tr. 417–18.)  During a visit, Dr. Robinson questioned Plaintiff's ability to keep working and meeting the requirements of his sex offender treatment.  (*Id.*)  And on June 27, 2007, they discussed whether Plaintiff should apply for disability and work only part-time.  (Tr. 416.)

On July 2, 2007, Plaintiff underwent a neuropsychological examination with Dr. Deborah Roman.  (Tr. 337–42.)  Plaintiff presented as dysphoric, with a very flat affect.  (Tr. 337.)  Plaintiff reported that he felt his decline in memory and attention had begun in February 2007, after he fell off a ladder, hit his head, and briefly lost consciousness.  (Tr. 338.)  However, Plaintiff underwent a brain MRI, and the results were normal.  (*Id.*)  Dr. Roman noted the following about Plaintiff's history.  Plaintiff was diagnosed with Fabry disease in 2000, a disease which caused kidney dysfunction and numbness in his left upper leg.  (*Id.*)  Plaintiff's attention to detail and perfectionistic approach prevented him from

---

[7]    Cachexia is general weight loss and wasting occurring in the course of a chronic disease or emotional disturbance.  *Stedman's Medical Dictionary* 265 (27th ed. 2000).

finishing his Ph.D. thesis.  (*Id.*)  He had started treatment for bipolar disorder in 1989, and he was hospitalized once for a manic episode.  (*Id.*)  The more depressed he was, the more trouble he had concentrating.  (Tr. 339.)  And Plaintiff was on probation and court-ordered sex offender treatment since 2002. (*Id.*)

During testing with Dr. Roman, Plaintiff was alert, attentive, and worked carefully, and he did not have difficulty understanding or following instructions. (*Id.*)  The results showed that Plaintiff's intelligence was in the above-average to superior range, as measured using the Wechsler Adult Intelligence Scale-III (*Id.*); his memory was somewhat inconsistent (Tr. 339–40); his executive abilities were grossly intact (Tr. 340); and his testing overall revealed a few mild abnormalities, raising the possibility of mild subcortical brain dysfunction.  (*Id.*) Dr. Roman noted that the abnormalities might have been caused by his recent head injury, or by Fabry disease and/or treatment for Fabry disease, or that depression alone might also have caused his cognitive impairments.  (Tr. 341.) Because his condition was mild, Dr. Roman recommended use of cognitive aids, such as note-taking and continued mental health treatment.  (*Id.*)

Plaintiff met with Dr. Robinson in July 2007, and Dr. Robinson noted that Plaintiff was obsessed with working at the time; he established goals for Plaintiff that allowed him to keep working full-time.  (Tr. 415.)  Dr. Robinson noted some improvement on July 17, 2007.  (Tr. 414.)  Unfortunately, Plaintiff was laid off from his job on or about July 31, 2007, which increased his depression.

(Tr. 413.)  At the end of August, Dr. Robinson encouraged Plaintiff to apply for disability and look for a part-time job.  (Tr. 412.)

In September 2007, Plaintiff put his disability application on hold and underwent vocational testing.  (Tr. 411.)  Plaintiff was considering the advantages and disadvantages of several courses of action: applying for disability; "trying to get retooled to work in a science lab" or applying for unemployment; investigating, applying, or volunteering for lab jobs; considering classes; and talking to contacts.  (Tr. 410.)  On September 28, 2007, Plaintiff saw Drs. Rae Hoesing and Michael Miner for vocational planning.  (Tr. 409.) Plaintiff was, at the time, temporarily employed but discouraged about finding permanent employment due to the barriers created by his sex offense.  (*Id.*)  Plaintiff agreed to do more research about four career options identified in his vocational testing.  (*Id.*)  And he agreed to inquire about university admission opportunities for people with felonies.  (*Id.*)  In October 2007, Plaintiff focused on obtaining a work license because his driver's license was suspended.  (Tr. 408.)

The following month, Plaintiff relapsed with self-injurious behavior, including hitting himself when his sister was mad at him.  (Tr. 405.)  He admitted hitting himself so hard that he left bruises on his legs.  (Tr. 402.)

In December 2007, one of Plaintiff's therapy assignments was to look for jobs online.  (Tr. 403.)  On December 12, 2007, Plaintiff seemed more cognitively intact than in the recent past, although he had not slept the previous night due to numbness and tingling in his hands and feet.  (Tr. 434.)  At the time, Plaintiff was

actively searching for a job.  (*Id.*)  His mental status examination was normal, with the exception of dysthymic affect and obsessional thought content.  (*Id.*)  And his judgment and insight were fair to good.  (*Id.*)

On January 8, 2008, Plaintiff reported that he got a temporary job.  (Tr. 401.)  However, in February 2008, Plaintiff suffered increased depression with suicidal ideation after having an argument with his parole officer.  (Tr. 400.)  In March 2008, one of Plaintiff's therapeutic goals was to apply for two science-related jobs per week.  (Tr. 397.)  But on April 1, 2008, Dr. Robinson noted that Plaintiff beat himself with a phone after having a fight with his sister.  (Tr. 395–96.)

Plaintiff saw Dr. Raymond on May 2, 2008, presenting with a stable mood and mild depression.  (Tr. 432.)  He was sleeping well, and his energy and focus were better.  (*Id.*)  He was looking for a job and hoping to get back into science.  (*Id.*)  His mental status examination was normal, and Dr. Raymond opined that Plaintiff was "quite stable."  (*Id.*)  Later that month, Dr. Robinson noted that Plaintiff was argumentative, but that he had improved since the last quarterly review.  (Tr. 394.)

Around the middle of May 2008, Plaintiff discontinued taking Celexa and Tegretol, due to dizziness and nausea.  (Tr. 431.)  His mood was normal, and there were no abnormal findings on his mental status examination.  (*Id.*)  However, Dr. Raymond was concerned that, being off medication, Plaintiff would develop a manic episode.  (*Id.*)  Therefore, she prescribed Lamictal.  (*Id.*)

Several months later, Dr. Robinson confronted Plaintiff about his difficulty with becoming distracted over minor details. (Tr. 389.) She noted that she believed this had contributed to his "offending cycle." (*Id.*)

In September 2008, Dr. Raymond noted that Plaintiff's mood appeared "quite stable," and there were no abnormal findings in his mental status examination. (Tr. 429.) At that time, Plaintiff reported that he was using Ambien occasionally for sleep, but overall he was sleeping pretty well without medication. (*Id.*)

In late November 2008, Plaintiff reported doing relatively well on the medications Celexa, Lamictal, and Ambien, although he was generally requiring Ambien to sleep at night. (Tr. 428.) At that time, his mental status examination was normal. (*Id.*) But Plaintiff was somewhat defensive and argumentative in therapy with Dr. Robinson a few days later. (Tr. 380.) And at their next session, Plaintiff reported he found it difficult to concentrate on one thing at a time. (Tr. 379.)

Dr. Raymond referred Plaintiff for inpatient psychiatric treatment on July 25, 2009, for manic behavior. (Tr. 541.) The fact that Plaintiff had Fabry disease made his medication management difficult, including a recent problem with treating his migraine headaches. (*Id.*) At the time of admission, he was working a number of part-time jobs, including apartment management and maintenance, volunteer GED teacher, and machinist. (Tr. 546.) His speech was pressured at times, his affect elevated, and he had trouble recalling events.

(Tr. 546.)  Plaintiff believed it was a hypomanic, not manic, episode, based on elevated mood and talkativeness.  (Tr. 544.)  He thought this might have been precipitated by his neurologist starting him on nortriptyline for migraine headaches.  (*Id.*)  Plaintiff's medications were then adjusted, and his insomnia and suicidal ideation improved, but he still felt some anxiety.  (Tr. 549.)  He was noted to have poor boundaries with female peers during hospitalization.  (*Id.*)  He was discharged on July 31, 2009.  (*Id.*)

In October 2009, Dr. Robinson assisted Plaintiff with his paperwork for unemployment assistance.  (Tr. 632.)  Plaintiff noted that he lost his job following his hospitalization.  (*Id.*)  In November 2009, during a session with Dr. Robinson, Plaintiff said he was extremely depressed for several weeks.  (Tr. 631.)  But his mental status examination was normal at that time.  (Tr. 646.)  In December 2009, Plaintiff found two jobs in which he was interested (Tr. 628), and he reported feeling much better.  (Tr. 645.)  His mental status examination was again normal.  (*Id.*)

In February 2010, Plaintiff was doing well, and handling his volunteer job without issues.  (Tr. 644.)  Dr. Raymond noted his mental status examination was normal, and his judgment and insight were good.  (*Id.*)  On April 9, 2010, Plaintiff's mood was stable and his thought content was negative for suicidal or psychotic content, but it was positive for perseveration and obsession.  (Tr. 640.)  His insight and judgment were fair.  (*Id.*)

Dr. Robinson discussed financial planning with Plaintiff in June 2010. (Tr. 620.)  At that time, Dr. Robinson noted that she had consulted with a legal aid attorney about social security disability.  (*Id.*)  She made the notations, "Functional restrictions caused by his impairment" and "GAF - < 50."  (*Id.*)

On July 7, 2010, the records reflect that Plaintiff was hoping to get disability benefits.  (Tr. 617.)  Dr. Robinson assisted him by reviewing his job history and suggesting how he could draft his comments for his claim, noting he had been let go from a number of jobs between 1989 and 1995.  (Tr. 617–18.) A few days later, Plaintiff told Dr. Raymond that he was depressed due to his unemployment ending.  (Tr. 638.)  Dr. Raymond's notes reflect that Plaintiff felt his depression was situational, and his mental status examination was normal. (*Id.*)  Later that month, Plaintiff told Dr. Robinson that he had a possibility of a full-time job in a "factory lab line."  (Tr. 615.)  Dr. Robinson approved of his applying for the job, under the condition that he would set boundaries to manage his time.  (*Id.*)

On July 16, 2010, Plaintiff saw Dr. Raluca Banica Wolters for management of Fabry disease.  (Tr. 750–51.)  Dr. Wolters had requested an evaluation of Plaintiff in February 2010, at which time Dr. Vishal Sagar, who completed the evaluation, assessed that Plaintiff's kidney disease was likely stage two.[8]

---

[8]     Stage two kidney disease is mildly reduced kidney function.  The Renal Association, *Stages 1 and 2 CKD*, http://www.renal.org/information-

(Footnote Continued on Next Page)

(Tr. 576.)  Plaintiff had been receiving lower doses of Fabrazyme for several months due to a shortage of supply.  (Tr. 750.)  Since then, he was having more pain in his hands and lower extremities, and numbness in his left thigh.  (*Id.*)  He also believed he was not thinking clearly, and his speech was sometimes slurred.  (*Id.*)  His psychiatrist had increased his dose of Celexa.  (*Id.*)  He looked depressed, but his physical examination was normal, with the exception of a patchy area of decreased sensation in the left thigh.  (*Id.*)  Unless his pain worsened, no additional treatment was recommended.  (Tr. 751.)

On August 30, 2010, Dr. Vishal Sagar noted that Plaintiff's kidney disease was stable in the last few years, and that Plaintiff felt okay overall, with reasonable appetite and energy level.  (Tr. 662.)  At that time, Plaintiff's kidney disease was in stage three.[9]  (Tr. 661.)  Plaintiff saw Dr. Sagar in follow up for stage three kidney disease in February 2011.  (Tr. 754–56.)  Plaintiff's physical examination was normal, and his kidney function was stable.  (*Id.*)

Also in August 2010, an evaluation at the Program in Human Sexuality of the University of Minnesota noted that Plaintiff's psychological and environmental problems included isolation, no intimate relationships, inability to complete his

(Footnote Continued from Previous Page)
resources/the-uk-eckd-guide/ckd-stages#sthash.Z7Ttvyce.dpbs (last visited August 11, 2014).

[9]    Stage three kidney disease involves moderately reduced kidney function. *Id.*

graduate degree, unemployment, debt, no source of income, and probation for a

sexual offense.  (Tr. 713.)  His GAF score at that time was 35.[10]  (*Id.*)  Plaintiff

continued to attend individual and group counseling and receive medication

management through November 2011.  (Tr. 795–842, 886–934.)

### B.    Providers' Opinions

On August 16, 2010, Dr. Robinson wrote a letter supporting Plaintiff's

disability application, which stated the following about Plaintiff.  (Tr. 611–13.)

Plaintiff was unable to say no to people, and they took advantage of him

financially.  (Tr. 612.)  Plaintiff was unable to consistently maintain a job, having

been let go from four jobs between 2001 and 2006.  (Tr. 611–12.)  He worked

excessively and did not clean his house or pay his bills.  (*Id.*)  He was involved in

two forklift accidents.  (Tr. 612.)  Plaintiff was preoccupied with details, causing

him to lose the major point of an activity, and affecting his ability to complete

tasks in a timely manner.  (*Id.*)  He was rigid and stubborn.  (*Id.*)  He came across

to others as odd.  (*Id.*)  He corrected everyone, including supervisors, about the

smallest details.  (*Id.*)  His behavior was sometimes inappropriate, such as

writing a long letter to a female sales clerk.  (*Id.*)  At times, he wore dirty, tattered

clothes.  (*Id.*)  And he struggled with concentration and distractibility because his

---

[10]     GAF scores between 31 and 40 indicate some impairment in reality testing
or communication or major impairment in several areas such as work, school,
family relations, judgment, thinking, or mood.  *DSM-IV-tr* at 32.

attention was easily drawn to unimportant external stimuli.  (Tr. 613.)

Dr. Robinson wrote a similar letter about Plaintiff two months later.  (Tr. 706–08.)

On March 8, 2011, Dr. Robinson completed a Psychological Medical Report in support of Plaintiff's disability application.  (Tr. 739–41.)  Again, she noted that Plaintiff offended people by correcting minor points, and his appearance was at times odd or poorly groomed.  (Tr. 739.)  She also noted that Plaintiff was unable to manage money, and in most of his friendships he allowed people to use him.  (*Id.*)

On January 7, 2012, Dr. Robinson completed a Medical Source Statement.  (Tr. 935–40.)  She noted that Plaintiff's GAF score was 35, and he had made some progress, improving his hygiene, personal care, and appropriateness with females.  (Tr. 935.)  She also noted that when Plaintiff did not meet his own perfectionistic standards, he engaged in self-injurious behaviors.  (Tr. 936.)  Dr. Robinson opined that Plaintiff was unable to meet competitive standards in the following areas: completing a normal workday and workweek without interruptions from psychologically based symptoms; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; dealing with normal work stress; awareness of normal hazards; setting realistic goals or making plans independently of others; interacting appropriately with the general public; maintaining socially appropriate behavior; and dealing with stress of semi-skilled and skilled work.  (Tr. 938–39.)  She opined that Plaintiff, while seriously limited, was not precluded from doing

the following: making simple work-related decisions; getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; understanding and remembering detailed instructions; and carrying out detailed instructions. (Tr. 938.)

Dr. Nancy Raymond also completed a Medical Source Statement on Plaintiff's behalf, dated March 21, 2012, and she authored a letter regarding the claimant. (Tr. 973–81; *see* Tr. 22.) She opined that Plaintiff had no useful ability to do the following: remember work-like procedures; work in coordination with or proximity to others without being unduly distracted; perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; understand and remember detailed instructions; set realistic goals or make plans independently of others; interact with the general public; and deal with stress of semiskilled and skilled work. (Tr. 975–77.) In addition, Dr. Raymond opined that Plaintiff was unable to meet competitive standards in the following activities: understand and remember very short and simple instructions; maintain attention for two hours; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; ask simple questions; accept instructions and respond appropriately to criticism from supervisors; be aware of normal hazards;

carry out detailed instructions; maintain socially appropriate behavior; travel in unfamiliar places; and use public transportation.  (*Id.*)  Finally, Dr. Raymond noted that Plaintiff was seriously limited but not precluded from carrying out very short simple instructions; maintaining regular attendance and being punctual within customary, usually strict tolerances; and sustaining an ordinary routine without special supervision.  (*Id.*)  She stated that Plaintiff would miss more than four days work per month due to psychological symptoms.  (Tr. 977.)  And she also noted that Plaintiff experienced medication side effects of drowsiness, fatigue, dry mouth, and lethargy.  (Tr. 980.)

Plaintiff's probation officer, Beth Tietz, submitted a letter to the Social Security Administration on March 22, 2012, in support of his disability application. (Tr. 316.)  She reported that she watched Plaintiff continue to struggle between employment and managing his mental health since 2003, and that she believed he was not able to do both.  (*Id.*)  When he became "overly focused" at work, she stated that he let other aspects of his life get out of control, like not paying his bills and letting his insurance lapse.  (*Id.*)  While she did not usually support her clients receiving disability benefits, she stated that she believed it was appropriate in Plaintiff's case, due to his "many issues."  (*Id.*)

## C.    Evidence Submitted to the Appeals Council

Plaintiff's counsel took Dr. Robinson's deposition on May 31, 2012, after the ALJ issued his decision.  (Tr. 982–93.)  At that deposition, Dr. Robinson testified as follows.  She began working with Plaintiff in March 2003, and she had

access to Dr. Raymond's treatment records, which indicated Plaintiff could not be adequately medicated for psychiatric disorders because he had impaired kidney functioning from Fabry disease. (Tr. 984.) In addition, his personality disorder interfered with his treatment, although he made a good effort. (*Id.*) Dr. Robinson testified that although she recommended that Plaintiff spend a month in jail for a parole violation, she believed his violation was caused by his psychological issues. (Tr. 984–85.)

As an example of Plaintiff's over attention to detail, Dr. Robinson testified that when given a simple assignment in therapy, he turned in thirteen written pages with arrows and notations. (Tr. 986.) In response to work-related stress, Plaintiff became more rigid. (Tr. 987.) And in his last job, he worked far more hours than was required. (*Id.*) Although Plaintiff always said he was laid off from his jobs, Dr. Robinson questioned whether that was true. (*Id.*) Dr. Robinson testified that she believed Plaintiff was capable of holding part-time employment. (Tr. 988.)

Dr. Robinson denied consulting with an attorney when completing a questionnaire on Plaintiff's work-related mental impairments and stated she had never known Plaintiff to be capable of balancing work and daily living activities. (*Id.*) She testified that Plaintiff's bipolar disorder caused mood swings, but his mania was controlled and depression was pervasive. (Tr. 990.) She also discussed treatment records that mentioned Plaintiff's dishonesty. (Tr. 991–92.) An example of his dishonesty was not telling his group members he loaned a

substantial sum of money to someone.  (Tr. 992.)  She explained that he did not understand that an omission of information was dishonest because his impairments caused him to "miss[] the point of things."  (*Id.*)

### D.    State Agency Consultants' Opinions

On September 10, 2010, Dr. Dan Larson reviewed Plaintiff's social security disability file, at the request of the SSA, and opined that Plaintiff's Fabry disease and kidney disease, likely stage 2, were nonsevere impairments because they were stable with treatment.  (Tr. 696–98.)  On reconsideration of Plaintiff's disability application on January 6, 2011, Dr. Patricia Bush reviewed Plaintiff's file and affirmed the conclusion that Plaintiff's Fabry disease and chronic kidney disease were nonsevere.  (Tr. 730.)  She noted that his creatinine[11] score was 1.5 in August 2010.  (*Id.*)  Otherwise, he had no significant findings upon examination in his August 2010 evaluation.  (*Id.*)

Upon request of the SSA, Dr. A. Lovko reviewed Plaintiff's social security disability file on September 7, 2010, and completed a Psychiatric Review Technique Form and Mental Residual Functional Capacity ("RFC") Assessment form.  (Tr. 676–95.)  Dr. Lovko opined that Plaintiff could understand, remember, and carry out unskilled to semi-skilled tasks.  Further, Dr. Lovko found that

---

[11]    Creatinine is a chemical waste product produced by muscle metabolism and, to a smaller extent, by eating meat.  Healthy kidneys filter creatinine from the blood.  Thus, creatinine tests reveal information about kidney functioning.  Mayo Clinic, Tests and Procedures: Creatinine Test, http://www.mayoclinic.org/tests-procedures/creatinine/basics/definition/prc-20014534 (last visited August 11, 2014).

Plaintiff could relate on at least a superficial ongoing basis with coworkers and supervisors, he could attend to tasks long enough to complete them, and he could manage the stress involved with unskilled to semi-skilled work.  (Tr. 694.) Dr. Ray Conroe reviewed Plaintiff's file on reconsideration of his disability application on December 29, 2010, and affirmed Dr. Lovko's opinion. (Tr. 726–28.)  Dr. Walter Rucker reviewed Plaintiff's disability file at the request of the SSA on January 12, 2011.  (Tr. 735–37.)  He affirmed Dr. Lovko's assessment, noting the treating psychologist's letter described Plaintiff's behaviors at their worst, but treatment notes indicated his progress, and his psychiatrist's treatment notes described him more positively.  (Tr. 737.)

## III.    Testimony at the Administrative Hearing

### Plaintiff's Testimony

Plaintiff, represented by counsel, testified at a hearing before the ALJ on April 5, 2012.  (Tr. 34–61.)  At the time of the hearing, Plaintiff was working part-time as a building janitor, in exchange for a rent reduction.  (Tr. 38.)  At most, he spent ten hours a week cleaning the building.  (Tr. 39.)  Plaintiff spent his days sleeping late, cleaning the building as needed, preparing for group therapy, attending therapy, and getting infusions to treat Fabry disease.  (Tr. 39.) The infusions required five hours, plus travel time.  (Tr. 40.)  He testified that he felt drained or fatigued the rest of the day.  (Tr. 51.)

Plaintiff had his driver's license and continued to drive, although he had been in an accident where he hit a pedestrian.  (Tr. 58.)  At the time of the

accident, he was coming home from work.  (*Id.*)  Plaintiff testified that he had

taken on too much responsibility at work and was tired all the time, but that now

he was only working ten hours per week.  (Tr. 58–59.)  In addition, he felt that if

he worked full-time again, he would have the same problems he had in the past.

(*Id.*)

Plaintiff also testified that he had lapses in his ability to concentrate related

to his depression or hypomanic states.  (Tr. 52.)  In a hypomanic state, he was

overly focused, almost out of control.  (*Id.*)  In a depressed state, his memory and

concentration worsened, causing him to have difficulty getting things done.  (*Id.*)

Plaintiff stated that he took medications with side effects of dry mouth and

drowsiness, and he often felt tired during the day and would take naps.  (Tr. 52–

53.)  Plaintiff explained that he had always forced himself to go to work, even

when depressed or sick.  (Tr. 54.)

Plaintiff also testified about his history.  He obtained a Master's degree and

was in a Ph.D. program, but a bipolar episode interfered with his education for a

year or two.  (Tr. 48–49.)   He believed his obsessive compulsive personality

disorder was a problem because he never felt his thesis was good enough to

present or publish.  (*Id.*)  He finally gave up working on his thesis around 1995,

and has not returned to school since then.  (*Id.*)

In 1992, Plaintiff inherited $600,000, but he testified that he lost it by

making bad investments with dishonest people.  (Tr. 41–42.)  For example, in

2004, he lost over $100,000 in a real estate venture.  (Tr. 42.)

Plaintiff stated that he had been seeing a counselor since 2002, when he committed a sexual offense.  (Tr. 46.)  He continued to see a counselor and was treated for bipolar disorder, obsessive compulsive personality disorder, and schizotypal personality disorder.  (*Id.*)  He went to individual therapy once every two weeks and group therapy once a week.  (Tr. 47.)  Plaintiff had also been seeing a psychiatrist, Dr. Raymond, every four to six weeks for the last six or seven years.  (*Id.*)

Plaintiff testified that his last severe manic episode was in 1989, but he continued to have hypomanic periods, including when he was hospitalized with a hypomanic episode several years ago.  (Tr. 47–48.)   He stated that he was depressed most of the time, but he was hypomanic a couple times per year.  (*Id.*)  In addition, his obsessive compulsive personality disorder manifested by his focusing on one thing, to the extent that he neglected other things.  (*Id.*)

Plaintiff's last full-time job, in 2008, was as a machinist at a cabinet shop.  (Tr. 44.)  He stated that he was so occupied with the job that he did not take care of himself, including when he had a couple of accidents at work.  (Tr. 45–46.)  He also had difficulty in other jobs, in terms of personal interactions.  (*Id.*)  Plaintiff testified that he would like to work, but that he does not believe he could work without having the same problems he had in the past.  (Tr. 42–43.)  Plaintiff testified that he had a pattern of being fired and becoming very depressed.  (Tr. 43.)

In addition, Plaintiff testified that in April 2012, he was depressed after serving a month in jail for violating his parole.  (Tr. 40.)  He stated he was depressed but not suicidal in jail, and that he was still seeing a probation officer every two weeks.  (Tr. 41, 50.)

## Vocational Expert's Testimony

William Rutenbeck testified at the hearing as a vocational expert. (Tr. 54–57.)  The ALJ asked him a hypothetical question as to whether an individual could perform Plaintiff's past work, assuming an individual of Plaintiff' age, education, and work experience, who could—due to his limitations in concentration, persistence, and pace—perform work limited to brief and superficial interactions with the public, coworkers, and supervisors.  (Tr. 55.) Rutenbeck gave two examples of jobs such a person could perform – machinist and router operator.  (*Id.*)

Adding to the first hypothetical question, the ALJ said to assume the individual was limited to three-to-four-step tasks that could be completed without any interaction with the public.  (*Id.*)  Rutenbeck testified Plaintiff's past relevant work was excluded by those limitations.  (Tr. 56.)  He testified, however, that there would be other work in the regional or national economy such a person could perform, including janitor/cleaner[12] and vehicle cleaner.[13]  (*Id.*)

---

[12]   Citing Dictionary of Occupational Titles ("DOT") Code 381.687-018, with 41,000 such jobs in the State of Minnesota.  (*Id.*)

(Footnote Continued on Next Page)

For a third hypothetical question, the ALJ said to assume the person would be off task in excess of 20% of the day or absent in excess of two days per month.  (*Id.*)  Rutenbeck testified that either limitation would preclude competitive employment.  (Tr. 56–57.)

In addition, in response to questioning by Plaintiff's counsel, Rutenbeck agreed the following limitations would render a person unemployable: no ability to remember work-like procedures; limited ability to remember short and simple instructions; and limited ability to carry out short and simple instructions, to the point where the person would have trouble doing a simple job.  (Tr. 57.) Rutenbeck also stated that a person would more than likely be unemployable if he was disruptive in the workplace due to a psychological condition.  (*Id.*)

## IV.    The ALJ's Findings and Decision

On April 11, 2012, the ALJ issued a decision concluding that Plaintiff was not disabled from his alleged onset date of March 1, 2008, through the date last insured of March 31, 2012, therefore denying Plaintiff's application for benefits. (Tr. 12–26.)  The ALJ followed the five-step evaluation set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The Eighth Circuit Court of Appeals has summarized the five-step evaluation process as follows: (1) whether the claimant is currently engaged in "substantial gainful

---

(Footnote Continued from Previous Page)

[13]     Citing DOT Code 919.687-014, with 6,900 such jobs in the State of Minnesota.  (*Id.*)

activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998) (citation omitted).

The ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period from his alleged onset date of March 1, 2008, through his date last insured of March 31, 2012. (Tr. 14.) At step two, the ALJ found that Plaintiff had the following severe impairments: "headaches, obsessive compulsive personality disorder (OCPD) versus avoidant personality versus schizotypal personality disorder, and bipolar disorder." (*Id.* (citing 20 C.F.R. § 404.1520(c)).) The ALJ concluded that Plaintiff's Fabry disease and resulting chronic kidney disease were not severe impairments because Plaintiff was stable on examination, with normal neurological functioning, gait, and strength. (Tr. 15 (citing Ex. 1F, 4F, 11F, 12F, 14F, 30F, 33F, 34F).)

At step three, the ALJ determined that Plaintiff's physical and mental impairments did not meet or medically equal one of the listed impairments in

28

20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15–17.)  Specifically, the ALJ stated that Plaintiff did not meet the "B criteria" of Listing 12.04 or 12.08 for affective and personality disorders because he had only mild restrictions in activities of daily living, evidenced by the fact that he lived independently, used a computer for mental exercises, studied for jobs, looked for work, and took naps if he had difficulty sleeping at night.  (Tr. 15.)   In addition, he used public transportation, drove a car, shopped three times per week, paid bills and managed a checkbook.  (*Id.*)  Although Plaintiff's neighbor reported that Plaintiff did not always wear clean clothes or comb his hair, and Plaintiff also paid bills late due to forgetfulness and he borrowed money from his sister, the ALJ noted that Plaintiff usually presented to his treatment providers with adequate hygiene and grooming.  (Tr. 15–16.)  In social functioning, the ALJ determined that Plaintiff had moderate difficulties because he talked to others on the phone, went shopping, and went to medical appointments; he did not report difficulty getting along with others; his providers did not indicate that he had trouble getting along with staff or other clients in the treatment context; and he did not report any social anxiety.  (Tr. 16.)  The ALJ determined that Plaintiff also had moderate difficulties in concentration, persistence, or pace.  (*Id.*)  He based that decision on the following:  Plaintiff alleged difficulty with memory and concentration, but he said he followed written and spoken instructions well; his neighbor indicated that Plaintiff could pay attention but did not finish what he started; Plaintiff's mental status examinations, particularly in 2011, did not indicate any abnormalities;

Plaintiff did not display difficulties in understanding, asking questions, or maintaining conversation in the treatment setting; and he appeared able to comprehend and attend to the hearing.  (Tr. 16–17.)  Further, Plaintiff had no episodes of decompensation of extended duration, and he did not establish the "paragraph C" criteria of the listings.  (Tr. 17.)

At step four of the evaluation, the ALJ found that Plaintiff had the RFC to perform:

> a full range of work at all exertional levels but with the following nonexertional limitations: work is limited to 3-4 step tasks; no interaction with the public is required to complete tasks; brief and superficial interaction with supervisors/coworkers is required to complete tasks.

(Tr. 17).  In reaching this RFC determination, the ALJ noted that Plaintiff's mental status examinations during the relevant time period were "quite unremarkable." (Tr. 19).  For example, in 2008, he was cooperative, responsive, and actively engaged in managing his mental illness, although at times, he had some trouble getting his ideas across.  (*Id.*)  In addition, in July 2009, Plaintiff was hospitalized with symptoms of hypomania and his GAF score was between 31 and 40, but his symptoms improved with treatment, his GAF score upon discharge was between 51 and 55, his memory appeared intact, and his insight was good.  (*Id.*)  Further, in 2010 and 2011, Plaintiff's mental status examinations were normal.  (Tr. 19–20.)

The ALJ also discounted Plaintiff's credibility for a number of reasons, including because the objective findings did not support the level of limitation he

alleged, his mental health records did not reflect great difficulty managing his

psychological symptoms, and the ALJ believed some records suggested Plaintiff

was seeking treatment solely to minimize legal consequences of his actions.

(Tr. 20.)[14]  The ALJ found Plaintiff's credibility to be in serious doubt because the

"weight of the evidence" indicated he is generally dishonest.  (*Id.*) The ALJ cited

examples from Plaintiff's treatment notes, including the following:  (1) on July 5,

2011, Dr. Robinson confronted Plaintiff for failing to admit that he canceled a

doctor's appointment in order to finish painting his apartment (Tr. 806); (2) on

December 20, 2011, Dr. Robinson noted that Plaintiff was still somewhat in

denial over his probation violation (Tr. 958); (3) in general, Plaintiff's treatment

records indicated that failing to share information about his treatment progress in

group therapy was a lie by omission; (4) in October 2011, Plaintiff admitted

keeping a secret from his group that a new friend offered to give him a car

(Tr. 902), and this is the "friend" who got him to violate his parole by going to a

strip club (Tr. 906); and (5) Dr. Robinson noted that Plaintiff had a "pattern of

pervasive lies" about his interactions with this "friend."  (Tr. 886.)  In addition, the

---

[14]     The ALJ cited Plaintiff's 2003 diagnostic assessment by Dr. Brian
Zamboni.  (Tr. 742–47.)  Therein it was noted that Plaintiff was seeking treatment
at the Program in Human Sexuality after being caught in a sexual relationship
with a 15-year-old girl.  (Tr. 742.)  Dr. Zamboni opined that Plaintiff might be
seeking therapy to help resolve or minimize his legal difficulties.  (Tr. 744.)  He
also cited an October 25, 2011 treatment record in which Plaintiff admitted to his
sex offender support group that he had not been following his treatment program
or the group's recommendations.  (Tr. 902.)

ALJ pointed out that Plaintiff testified he lost all of his jobs due to his medical condition, but the record showed he was laid off with the majority of his coworkers.  (*Id.*)[15]

The ALJ found that Plaintiff's daily activities were consistent with the type of work described in his RFC finding.  (*Id.*)  The ALJ explained that Plaintiff could care for himself, obtain medical treatment, socialize, use public transportation, and drive without incident.  (*Id.*)  In addition, Plaintiff tutored GED classes, indicating he could understand and recall simple instructions.  (*Id.*)  Plaintiff also performed some work activity for neighbors and earned cash during the applicable time period.[16] (*Id.*)  He also worked part-time as a janitor without difficulty.  (*Id.*)  Further, Plaintiff continued to apply for employment during the relevant time period, and his psychologist helped him complete and revise cover letters for jobs, suggesting that she believed he was capable of work.  (Tr. 21.) And the ALJ found that Plaintiff's impairments were present at approximately the same level of severity prior to his alleged onset date, particularly in 2007, but he was able to maintain working at a level of substantial gainful activity during that time.  (*Id.*)  Ultimately, the ALJ questioned Plaintiff's motivation to work because

---

[15]    The ALJ cited Dr. Zamboni's 2003 assessment, where Plaintiff told Dr. Zamboni he was laid off his job as a machinist in 2003, along with the majority of his coworkers.  (Tr. 744.)

[16]    The ALJ cited an October 2009 treatment record, wherein Dr. Robinson questioned whether Plaintiff received cash for work he had been doing for a neighbor.  (Tr. 632.)

his work history indicated sporadic employment.  (*Id.*)[17]  And the ALJ believed

Plaintiff's criminal history and his recent jail time were the primary barriers to his

obtaining employment.  (*Id.*)

Next, the ALJ explained what amount of weight he gave to the various

medical opinions and other opinions in the record.  For example, Plaintiff's

probation officer, Beth Tietz, submitted a letter to the SSA in March 2012, opining

that Plaintiff was unable to manage his life while he was employed, due to his

multiple mental impairments.  (*Id.*)  Tietz opined that he could not be employed

given his many issues.  (*Id.*)  The ALJ gave Tietz's opinion little weight because

she is not a medical provider, she did not offer any specific work-related

limitations, and she was not qualified to do so.  (*Id.*)  Nonetheless, the ALJ

believed limiting Plaintiff to unskilled work accommodated the issues Tietz

described in her letter.  (*Id.*)

The ALJ also considered Dr. Raymond's Medical Source Statement, and

the letter she wrote regarding Plaintiff, both of which are described above.

(Tr. 22.)  When Dr. Raymond assessed Plaintiff with a GAF score of 55, this

indicated that Plaintiff had moderate symptoms and difficulties in functioning.

(*Id.*)  The ALJ found this inconsistent with Dr. Raymond's opinion that Plaintiff

was unable to meet competitive standards in several areas of work-related

functioning.  (*Id.*)  Dr. Raymond also stated that Plaintiff's mental status

---

[17]     Plaintiff's work history report shows a gap in employment between 1995
and 2001.  (Tr. 320.)

examinations generally indicated logical thought processes but obsessional/perseverative thinking over life issues, stressors, personal interactions, suspicion of others, discomfort in social situations, and suicidal ideation at times.  (*Id.*)  She opined that Plaintiff's mood would preclude him from maintaining focus for long periods of time.  (*Id.*)  And she opined that his personality disorder might preclude flexibility and adapting to changes.  (*Id.*)  In determining Plaintiff's mental RFC, the ALJ gave Dr. Raymond's opinion little weight because her records of Plaintiff's mental status examinations did not support her opinion.  (*Id.*)  Specifically, Dr. Raymond did not indicate obsessional/perseverative thinking, suspicion of others, discomfort in social situations, or suicidal ideation for Plaintiff during the relevant time period.  (*Id.*)

The ALJ addressed Dr. Robinson's opinions (described above) as well. The ALJ gave Dr. Robinson's opinions "very little weight" because her conclusions did not match her general mental status examination findings regarding Plaintiff.  (Tr. 24.) The ALJ said that Dr. Robinson's opinions about Plaintiff's inability to work were inconsistent with Dr. Robinson's assistance to Plaintiff in seeking employment.  (*Id.*)  The ALJ also found that Dr. Robinson's notation in a record that the "judge did what we asked" reflected her role as an advocate, not simply a provider of medical services.  (*Id.*)  The ALJ said that it appeared that Dr. Robinson uncritically accepted Plaintiff's subjective complaints as true when there was good reason to question Plaintiff's reliability.  (*Id.*)

The ALJ accepted that Plaintiff had unsuccessful work attempts in the past, but he rejected the conclusion that this proved Plaintiff could not work now. (*Id.*)  He stated such a conclusion ignored inconsistencies in the claimant's allegations "and the entire body of evidence."  (*Id.*)  The ALJ also noted that Plaintiff's past work was semi-skilled or skilled, and he restricted Plaintiff to unskilled work.  (*Id.*)

Ultimately, at step four of the disability determination procedure, the ALJ found that Plaintiff was not capable of performing his past relevant work. (Tr. 24.)  But at step five, based on the vocational expert's testimony, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.  (Tr. 25–26.)  Thus, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act, at any time from March 1, 2008, through March 31, 2012.  (Tr. 26.)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings. *Id.* (quoting *Parsons v. Heckler*, 739 F.2d 1334, 1339 (8th Cir. 1984)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell*

36

*v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213

(concluding that the ALJ's determination must be affirmed, even if substantial

evidence would support the opposite finding).  The possibility that the Court could

draw two inconsistent conclusions from the same record does not prevent a

particular finding from being supported by substantial evidence.  *Culbertson v.*

*Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citations omitted).

The claimant bears the burden of proving his or her entitlement to disability

insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a);

*Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928

F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or

she cannot perform past work due to a disability, "the burden shifts to the

Commissioner to prove, first that the claimant retains the residual functional

capacity to do other kinds of work, and, second that other work exists in

substantial numbers in the national economy that the claimant is able to do."

*Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.   Analysis of the ALJ's Decision

In support of his motion for summary judgment, Plaintiff makes two

arguments: (1) that the ALJ failed to properly evaluate the opinions of

Dr. Robinson and Dr. Raymond; and (2) that the ALJ failed to fully and fairly

develop the record concerning the work limitations caused by Plaintiff's need for

Fabrazyme infusion treatments.  (Doc. No. 19, Pl.'s Mem. in Supp. of Mot. for

Summ. J. ("Pl.'s Mem.") 16–32.)

## A. Treating Providers' Opinions

An ALJ determines RFC by considering all evidence in the record, weighing physician and other providers' opinions, and assessing credibility. *Pearsall v. Massanari*, 274 F.3d 1211, 1217–18 (8th Cir. 2001).  Treating physicians' opinions are entitled to controlling weight if "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record.  *Pirtle v. Astrue*, 479 F.2d 931, 933 (8th Cir. 2007) (quoting *Prosch v Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000)).  An ALJ may give less weight to a physician's opinion if the opinion is based largely on the claimant's subjective complaints rather than on objective medical evidence.  *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).

A claimant's subjective complaints cannot be discounted solely on the basis of lack of objective findings to support the severity of his complaints. *Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984).  An ALJ must consider, but need not discuss, each of the following factors in making a credibility assessment: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.  *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009).  When an ALJ provides good reasons for his credibility

finding, courts should defer to that finding, because the ALJ is responsible for deciding questions of fact. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).

Plaintiff asserts that Drs. Robinson and Raymond knew Plaintiff well and were in the best position to evaluate his impairments. (Pl.'s Mem. 16–17.) Even if their opinions are not entitled to controlling weight, Plaintiff contends they should be afforded the greatest weight. (*Id.* at 18.) Plaintiff further asserts that the Court should consider Dr. Robinson's sworn statement, taken after the ALJ's decision, because it was submitted to the Appeals Council. The Court will review the statement to determine if the record as a whole, including Dr. Robinson's sworn statement, supports the ALJ's determination. *See Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012) (describing standard of review of new evidence that was considered by Appeals Council before declining review). Based partly on the new evidence, Plaintiff contends that none of the reasons the ALJ gave for discounting Dr. Robinson's opinions were valid. (Pl.'s Mem. 20–21.) However, the Court concludes that the ALJ's decision to afford little weight to the opinions of Drs. Robinson and Raymond is properly supported by the record in this case.

Although Dr. Robinson had a longstanding treating relationship with Plaintiff, the ALJ concluded that Dr. Robinson's mental status examination findings did not establish the level of limitation that Dr. Robinson found in her assessment of Plaintiff's work-related abilities. For example, Dr. Robinson concluded that Plaintiff's mental status was normal in examinations conducted in October and December 2009, and again in February, April, and July 2010. The

ALJ noted that Dr. Robinson apparently relied quite heavily on Plaintiff's subjective report of symptoms and limitations but, as described above, the ALJ concluded, based on evidence in the record, that Plaintiff's subjective complaints were not reliable.

Another reason why the ALJ gave little weight to Dr. Robinson's assessment of Plaintiff's work-related ability was the fact that she continued to assist Plaintiff in seeking employment.  Although Dr. Robinson testified that she believed Plaintiff could perform part-time work, the treatment records suggest that she did not limit Plaintiff to part-time work, even though she had considered doing so because Plaintiff was working too many hours and not fulfilling his sex offender treatment requirements.  (Tr. 334, 423, 426.)  Plaintiff was laid off his job in July 2007, and subsequently, Dr. Robinson helped Plaintiff get vocational assistance.  (Tr. 409–10.)  Plaintiff was concerned about employment barriers related to his offense.  (Tr. 409.)  Nevertheless, four career paths were identified for him, and Dr. Robinson encouraged Plaintiff to follow up and apply for jobs. (Tr. 408, 391.)  His volunteer job was going well in February 2010.  (Tr. 644.)  And Plaintiff sought and received permission from Dr. Robinson to apply for a full-time job in July 2010.  (Tr. 615.)  Substantial evidence in the record supports the ALJ's conclusion that Plaintiff's unemployment could be explained by the difficulty of finding a job due to his criminal history, rather than his mental impairments.  As noted by a state agency psychological consultant who reviewed Plaintiff's medical records for the SSA, Dr. Robinson's opinions of Plaintiff's

functioning represented his impairments at their worst.  (Tr. 737.)  The relevant time period for Plaintiff's disability evaluation is after he was laid off, when his functioning had improved, and he was actively seeking employment.

Next, Plaintiff contends the ALJ failed to give good reasons for rejecting Dr. Raymond's opinion.  (Pl.'s Mem. 24.)  Plaintiff asserts Dr. Raymond relied on objective evidence in support of her opinions of Plaintiff's functioning. (*Id.* at 25.)  The ALJ discounted Dr. Raymond's opinion because her treatment records indicated that Plaintiff's mental status examinations were normal. (Tr. 22.)  Indeed, Dr. Raymond's treatment records suggest Plaintiff was, during most of the relevant time period, quite stable and not exhibiting impaired mental functioning in mental status examinations.  (*See, e.g.*, Tr. 428–44; 638–56; 840–42; 931–34; 971–72.)  There were very few instances where Dr. Raymond noted that Plaintiff's thought content was perseverative or suicidal, the clinical findings she used to support her opinion.  (*See, e.g.*, Tr. 640.)  Plaintiff recovered quickly from a hypomanic episode, which might have been caused by a medication change, and he was hospitalized for one week in July 2009. (Tr. 541–50.)  In all, the ALJ correctly determined that Dr. Raymond's treatment records were inconsistent with her opinion.  *See Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006) (holding the ALJ properly discounted treating physician's opinion where it was inconsistent with other substantial evidence in the record).

Moreover, the ALJ offered a good reason for finding Plaintiff capable of a limited range of unskilled work.  (Tr. 24.)  Drs. Robinson and Raymond discussed

in detail how Plaintiff's mental impairments related to perfectionism and obsessive focus on details, causing him to take too long to complete a task or to miss the point of a task.  The ALJ noted that Plaintiff's past work was semi-skilled and skilled, but the ALJ limited Plaintiff to unskilled work.  (*Id.*)  In unskilled work, Plaintiff would not be required to perform detailed work that might cause him to lose his focus.  In fact, the ALJ's opinion was consistent with Dr. Raymond's opinion that Plaintiff was not precluded from carrying out very short simple instructions; maintaining regular attendance; being punctual within customary, usually strict tolerances; and sustaining an ordinary routine without special supervision.  (Tr. 975–77.)

The ALJ also accommodated Plaintiff's social difficulties, described by Dr. Robinson as correcting supervisors over minor mistakes, odd appearance, and difficulty interacting with females, by limiting Plaintiff to work requiring only brief and superficial contact with coworkers and supervisors, and no interaction with the public required to complete tasks.  (*Id.*)  On January 7, 2012, Dr. Robinson stated that Plaintiff had improved his personal appearance and appropriate behavior with females.  (Tr. 935.)  Plaintiff's part-time work and job seeking are also inconsistent with disability.  *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038–39 (8th Cir. 2001) (explaining that seeking work and working part-time were inconsistent with disability).

Finally, the ALJ found that Plaintiff's impairments were of about the same severity in 2007, and Plaintiff maintained full-time employment despite his

impairments in 2007.  As described above, Plaintiff's sex offender treatment

required him to attend frequent treatment and make progress toward his goals,

and Dr. Robinson was concerned that Plaintiff was allowing his obsession with

work and working excessive unpaid hours to interfere with treatment.

Nonetheless, she supported Plaintiff's continued work.  Furthermore, Plaintiff was

not fired from this job, he was laid off.  Plaintiff continued to work part-time and to

look for full-time work.  Although the record could support more than one

conclusion, it supports the ALJ's conclusion that Plaintiff's layoff, subsequent

search for employment, and criminal history could better explain his continued

unemployment.  This, together with Plaintiff's mostly normal mental status

examinations during the relevant time period, is substantial evidence in the

record as a whole supporting the ALJ's decision to discount Drs. Robinson's and

Raymond's opinions.

### B. Duty to Develop the Record

Plaintiff also contends that the ALJ failed to fully and fairly develop the

record concerning his work-related limitations from Fabry disease.  (Pl.'s Mem.

25–32.)  Specifically, Plaintiff points out that a state agency medical consultant

opined that Plaintiff's Fabry disease did not result in any limitations, but asserts

that the consultant was mistaken that Plaintiff had stage two kidney disease,

when it was actually stage three.  (*Id.* at 30 (citing Tr. 697, 754, 756).)  Therefore,

Plaintiff contends the record is unclear as to work-related limitations from stage

three kidney disease, and the ALJ should have further developed the record regarding Plaintiff's Fabry disease.   (*Id.* at 30–32.)

The Commissioner points out that the ALJ cited to the exhibits that contained Plaintiff's stage three kidney disease diagnosis; therefore, the Commissioner asserts there is no reason to believe the ALJ was unaware of the diagnosis when he determined Plaintiff's kidney disease was not a severe impairment.  (Doc. No. 26, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 21–22.)  Noting that Plaintiff's kidney disease progressed to stage three on or about August 2010, the Commissioner asserts his kidney condition was repeatedly described as stable thereafter, and there were no abnormal findings on examination through December 2011.  (*Id.* at 22–23.)  The Commissioner also contends that Plaintiff's attorney stated the record was complete at the administrative hearing, and should not now be allowed to demand remand for failure to develop the record, particularly where Plaintiff has not attempted to demonstrate how further development of the record might establish disability. (Def's Mem. 18–21.)

An ALJ has a duty to fully and fairly develop the record, even when the claimant is represented by an attorney.  *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).  Here, the ALJ found Plaintiff's Fabry disease and kidney disease were  nonsevere impairments.  (Tr. 14–15.)  The ALJ cited to exhibits containing the diagnosis of stage three kidney disease.  (*Id.* (citing Ex. 30F, 33F, 34F).) Further, on reconsideration of Plaintiff's disability claim on January 6, 2011,

Dr. Patricia Bush, a state agency medical consultant, reviewed Plaintiff's treatment records.  (Tr. 730.)  She specifically noted Plaintiff's August 2010 evaluation of Fabry and kidney disease.  (*Id.*)  Plaintiff was diagnosed with stage three kidney disease on August 30, 2010.  (Tr. 661.)  Nonetheless, Dr. Bush opined Plaintiff's physical impairments were nonsevere.  (Tr. 730.)

There is nothing in the record suggesting that Plaintiff's physical impairments worsened in any significant or lasting manner after this determination by Dr. Bush.  Furthermore, Plaintiff has not suggested how going from stage two to stage three kidney disease has caused him any functional limitations, and the record does not reflect any work-related limitations.  For these reasons, the Court finds no reason that the ALJ should have further developed the case on this issue.  *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (holding that an ALJ is not required to seek clarifying statements from a treating physician unless a crucial issue is undeveloped).

Finally, Plaintiff contends he would miss work two days per month for enzyme infusion treatment, which was performed every other week and lasted five hours, leaving Plaintiff feeling tired the rest of the day.  (Pl.'s Mem. 31–32.)  However, Plaintiff is incorrect that the vocational expert testified that two days of absence from work per month would preclude competitive employment.  (Pl.'s Mem. 32.)  The vocational expert testified that absences in excess of two days per month would preclude competitive employment.  (Tr. 56–57.)  In addition, as the Commissioner has pointed out, there is nothing in the record indicating that

45

Plaintiff could not make appointments around his work schedule. (Def.'s Mem. 24.) Moreover, Plaintiff worked forty-five hours per week while receiving this treatment in the past. (*Id.* (citing Tr. 334).)

In response, Plaintiff asserts that in addition to infusion treatments, he has at least two hours of therapy every week. (Doc. No. 28, Pl.'s Reply Br. 6.) Plaintiff contends that the ALJ should have included his need for treatment in the hypothetical question to the ALJ. (*Id.* at 6–7.) But it is undisputed that Plaintiff worked full-time in the past while receiving treatment, and his work was semi-skilled or skilled. (*Id.* at 6–7.) And the ALJ did not find Plaintiff was capable of his past work, but that he was capable of unskilled work. (*Id.*) Even so, Plaintiff points out that the burden of proof shifted to the Commissioner at step five of the evaluation, and the ALJ cannot assume the unskilled jobs available to Plaintiff would accommodate his treatment schedule. (*Id.*) Therefore, Plaintiff argues remand for vocational expert testimony is required. (*Id.*)

Plaintiff cites *Eback v. Chater*, 94 F.3d 410 (8th Cir. 1996). In *Eback*, it was uncontested that the claimant needed to use a nebulizer daily, once between 7:00 and 8:00 a.m., and again between 2:00 and 3:00 p.m. *Id.* at 411–12. The vocational expert testified he assumed the employer would make an accommodation. *Id.* at 412. The court held this was an improper assumption, particularly because many of the jobs cited by the ALJ that the claimant could perform were "shift jobs," which might not allow breaks necessary for Eback's use of a nebulizer. *Id.* And the vocational expert did not testify that

the jobs he cited would allow breaks during an eight-hour day, as would be required by Eback's condition.  *Id.*

The Commissioner cites *Brown v. Astrue*, No. 08-cv-4026-C-NKL-SSA, 2008 WL 4151613 (W.D. Mo. Sept. 2, 2008).  (Def.'s Mem. 24.)  In *Brown*, the district court found no evidence that the claimant's treatment required a full day's absence or that she would need to miss work to receive treatment.  *Id.* at *2. Furthermore, the ALJ had considered possible absences when he determined Brown's RFC.  *Id.*

Here, the record clearly establishes that Plaintiff required about three hours, sometimes more, for enzyme infusion treatment, once every other week. Plaintiff usually received this treatment beginning anywhere between two and four in the afternoon.  On occasions, he received the treatment around nine in the morning.  The record, however, does not support Plaintiff's contention that the treatment made him unemployable, as he had the injections without difficulty for years.  (*See, e.g.*, Tr. 767, 779, 865–66.)  And the record does not support the conclusion that Plaintiff's infusion treatment would require him to miss two full days or more of work every month.  In fact, the record reflects that Plaintiff's past work only interfered with his *sex offender treatment* when he allowed himself to work excessive overtime hours, which was unnecessary.  In all, the record does not support Plaintiff's contention that his treatment precludes competitive employment.  For these reasons, this case is distinguishable from *Eback*, and remand for additional vocational testimony is unnecessary.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1.   Plaintiff's Motion for Summary Judgment (Doc. No. 18), is **DENIED**;

2.   Defendant's Motion for Summary Judgment (Doc. No. 25), is **GRANTED**; and

3.   The case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: August 13, 2014                    _s/ Jeffrey J. Keyes_____
                                         JEFFREY J. KEYES
                                         United States Magistrate Judge